**OREGON NATURAL RESOURCES COUNCIL, et al., Plaintiffs,**

v.

**John O. MARSH, Jr., in his official capacity as Secretary of the United States Department of the Army, et al., Defendants.**

**Civ. No. 85–6433–BU.**

United States District Court, D. Oregon.

Aug. 31, 1987.

Gary K. Kahn, Reeves & Kahn, Neil S. Kagan, Portland, Or., for plaintiffs.

Thomas C. Lee, Asst. U.S. Atty., Portland, Or., Dorothy R. Burakreis, Land and Natural Resources Div., General Litigation Section, U.S. Dept. of Justice, Washington, D.C., John R. Seeronen, Asst. Dist. Counsel, Portland, Or., of counsel, for defendants.

## OPINION AND ORDER

JAMES M. BURNS, District Judge.

### I. INTRODUCTION

This dam case is back. When the case was here before, there was only a dam plan. Now there is half a dam.[1] The chore assigned on remand by the Court of Appeals requires me to determine what sort of half dam is a good (i.e., safe) half dam and which is a bad (i.e., unsafe) half dam. This assignment might seem strange, since my efforts earlier to determine whether the dam plan was good were not even half as good as those of the Court of Appeals.[2]

The history of this litigation may be found in my opinion of March 3, 1986, 628 F.Supp. 1557 and the June 23, 1987 opinion of the Court of Appeals, 832 F.2d 1489. In essence, the June 23 ruling orders the Corps of Engineers back to the NEPA drawing board. In the meantime, my assignment is to determine what sort of injunctive relief is appropriate when a large scale construction project—with many highly technical aspects—is sought to shut down, or placed on full, or partial hold while NEPA requirements are met. Thus, from the outset, after remand, I had called upon the parties to present various alternatives for me to evaluate in determining "appropriate" relief.

---

1. This characterization must not be misunderstood. The dam, as a structure is not half-built. (Indeed, as explained elsewhere, the structure is currently up to elevation 1,533 on one side and only 1,500 on the other; the ultimate elevation is 1,729.) Rather, this is a shorthand expression to reflect that the main dam contract ($64,078,-000) had been performed to the extent of $30,-394,000, or almost one-half, as of June 30, 1987; that latter figure is now no doubt higher.

2. As I read the June 23 opinion of the Court of Appeals, the plaintiffs' assert eight claims of error in my ruling. The Court found reversible error in five, but affirmed on three. In baseball, a batting average of .375 is enviable indeed. Judiciary wise, such an average sends one to the showers in a hurry.

The Elk Creek project involves four[3] main contracts:

a) Construction of the structure itself, including a large quarry and rock crushing operation;

b) Construction and operation of a fish collection facility, about 600 feet downstream of the dam;

c) The reservoir clearing contract, intended so as to prepare the upstream area so as to accommodate the pool of 1,347 acres which will exist when the dam is completed;

d) The archeological contract.

Of these, only the first needs lengthy explanation. Interruption of the schedule of completion of the structure involves evaluation of safety risks if a full shut down order as to structure were ordered. These risks, in turn, depend upon technical complexities of a severe order, and upon estimates of probabilities as to flooding during the fall and winter of 1987–88. The other three, by comparison, need only brief discussion. I turn to the first.

## II. WHERE AND HOW SHOULD THE STRUCTURE BE HALTED?

### A. Dam Structure Itself

When the panel issued its opinion, the structure had risen to the 1,533 elevation level on the left side of the diversion outlet structure in the center. On the right side, the elevation had reached only 1,500 feet. Resumption of the structure could not begin—for reasons explained below—until sometime in the fall, most probably in late October, 1987. Thus, if no further work were allowed, and if fall and winter rain and snow were great enough, the gap on the right side would likely present flood danger downstream since only a small coffer dam on the right side would stand to restrain the water accumulating upstream.

At this point, "RCC" (roller compacted concrete) must be explained, since this is an RCC structure. Use of this method is cheaper and speedier. When employed correctly, it is equally safe as conventional concrete. RCC operations involve a continuous flow of concrete by which a fleet of trucks deliver and deposit it at a rate of up to 900 cubic yards per hour. As RCC is deposited, giant bulldozers spread it out so that the surface is built up in roughly 3 foot increments. Roller machines smooth and compact it so that, in effect, a succession of layers are deposited, somewhat like a chef preparing a multi-layer cake. RCC application (and pouring) is not a summertime thing. Hot weather effects allow stresses to develop which cause unacceptable cracking within the dam structure. Also, it is more difficult during hot weather to maintain desirable workability preventing proper consolidation of RCC. As a consequence, RCC operations ended in late May. They would not have resumed until about late October even in the absence of the June 23 ruling.

It was in this setting that I had asked the Corps to present and to evaluate several alternatives for me to consider. The Corps responded in the form of a submission filed July 28, 1987, along with relevant photographs which had been shown during the July 18 visit to the site.

---

**3.** The contracts not involved in this matter are:

(1) *Highway Relocation Contracts.* The relocation of the county road has been physically completed. Administrative closeout of contracts is underway.

(2) *Supervisory Control System.* This supply contract provides the supervisory control and data acquisition (SCADA) system for the complete control and supervision of Lost Creek Lake, Applegate Lake, and Elk Creek Lake Dams from the Lost Creek control room. The contract will continue unaltered irrespective of the condition of the Elk Creek project since a spare system would be of future use in maintenance.

(3) *A–E Survey Contract.* This survey contract provides for the reestablishment of boundary and other survey markers affected by project construction and should continue.

(4) *Johnson Brothers Ditch Water Rights Purchase.* This activity involves the purchase of water rights associated with the now-inactive Johnson Brothers ditch. Historically, the ditch received water from within the present project boundary and delivered it to residents downstream. Construction of the project destroyed the headworks. This activity will continue regardless of project condition.

The alternatives presented were as follows:

a) An immediate shutdown of all project-related activities and the termination of all contracts;

b) Partial completion of the dam [to the 1,545 foot level] and appurtenant works, but full completion of the fish facility;

c) Full completion of the dam, appurtenant works, and fish collection facility without reservoir clearing and filling;

d) Full completion and operation of the project and fish collection facility as currently scheduled.

P. 8, July 27 Alternatives.

Partial completion alternatives were the subject of discussion among Messrs. Steinkamp (project engineer); Schroeder (plaintiffs' expert) and Beeman (court's expert) during their site inspection on August 11. At that time, those gentlemen discussed three separate possibilities: a) raising the elevation to 1,533 on the right side; b) raising the elevation to 1,545 for the full structure, or c) raising the elevation to 1,563 for the full structure. Under (b) a spillway could be installed which would be located in the same position as that planned for full completion, i.e., aligned with the spillway basin immediately downstream. At this level, however, its depth would be only 12 feet, reducing sharply its capacity to allow a safe method of carrying water downstream in the event of unusually heavy runoff. Under (c) a spillway 30 feet high would be created; this would allow for the same discharge capability as would exist upon full completion to the 1,729 foot elevation.

It was out of this discussion that Beeman's recommendation emerged. (Beeman offered his tentative views at the August 14 hearing, and furnished a written recommendation to the parties and to me dated August 24.) I commend these three gentlemen for a helpful discussion which was professional, and purged of partisanship to the maximum extent possible, even though Steinkamp and Schroeder necessarily were partisans in a sense. I am deeply grateful to all of them for their help.

■ As shown elsewhere, I find and hold that injunctive relief which is "appropriate" is to allow the Corps to continue construction of the structure so as to bring it to the 1,563 foot elevation as soon as the contractor can resume RCC operations this fall. Further elevation of the structure will not be permitted until NEPA requirements are met. I believe this furnishes a margin of safety so as to avoid disaster downstream if the runoff is unusually heavy. It balances, as best I can, the interests of the plaintiffs under NEPA; it reduces serious dislocation, at least until probably late November or mid-December, for the contractor and its employees.

B. Soils Issues

There are three soils issues: erosion of soils in the reservoir, backfilling the key trench, and excavation of the rock "nose." In reviewing these issue I distinguish between those matters that will be influenced by my injunction and those that would exist regardless of action taken by the Court of Appeals or me.

Under the Corps' plan for dam construction, and absent injunctions from the courts, there would be weathering of exposed soils and a potential for erosion in the area upstream this winter. Allowing the dam to be constructed to a level of 1,563 feet will not produce substantially different conditions this winter than would otherwise have been the case because the reservoir would not have been controlled until the fall of 1988. The adverse results of draw-down that were brought to my attention will occur over the long-term rather than the short-term. If this case is in an uncertain setting one year from now, the condition of soils in the reservoir should be revisited. Any decision regarding the exposed slopes upstream of the dam can be made then.

Excavation of the key trench resulted in detectable movement of soil in the right abutment. Allowing the dam to be constructed to a level of 1,563 feet will fill much of the key trench thus reducing this

downstream movement. If the Corps deems it necessary to backfill the remainder of the key trench, it is permitted to do so. However, I specifically reject the Corps proposal to cover the entire foundation with a twenty-foot blanket of concrete.

According to Mr. Beeman, court expert, the question of continued movement of soils in the right abutment and in the area above in the direction of the valley, thus threatening the diversion and regulating outlets, is one that remains irrespective of dam completion alternatives. If the Corps concludes this is a problem, the Corps is permitted to take whatever mitigation measures it deems appropriate. Similarly, the condition of the rock "nose" is to be evaluated by the Corps and the Corps is permitted to take whatever mitigation measures it deems appropriate in light of my dcision to allow dam construction to a level of 1,563 feet.

Although the Corps is in a better position than I to evaluate the necessary mitigation work, I anticipate it could include some excavation of the slope in the direction of the valley to reduce slide potential. I share the opinion of Mr. Beeman that this work, if shown to be required to prevent a slide, is in the best interest of all parties regardless of the completion or noncompletion of the dam.

### C. Quarrying Issues

On July 22 I enjoined quarrying activities except those necessary for the alignment (plus rip-rap and back fill) of stream banks downstream of the dam. If the injunction were lifted, all quarrying activities would be completed by May 1988.

All overburden in the quarry areas has been removed and stockpiled. Additional quarrying activity will not result in the removal of additional overburden; all rock removal would take place within the confines of the previously cleared quarry activity. Once quarrying activities are completed, the quarry will be restored, i.e., the vertical walls would be shaped, topsoil will be replaced and area will be seeded. In addition, the unsightly conveyor belt equipment will be removed.

Resident Engineer Steinkamp testified that if the injunction remains in place, the vertical walls of the quarry must be shaped and restored to prevent deterioration of the rock. He testified that without this protection, continued fracturing and instability in the vertical walls would result in their collapse by the winter of 1989 and uncontrolled runoff and turbidity in the watershed.

He further testified that a continuation of the injunction would cost up to $10 million. These costs would be associated with the demobilization and remobilization of the necessary conveyor belt equipment to complete the extraction and stockpiling of rock required for the roller-compacted concrete placement. He also testified that continued placement of rock in stockpiles at the worksite, even if the main dam is not completed, will not cause additional environmental degradation. All this testimony was uncontroverted by plaintiffs.

Uncontroverted testimony was also presented that there exists a market in southern Oregon for the rock that would be removed from the quarry. Should the dam not be completed, the rock could be sold to the public. The sale of this rock would allow some costs associated with the dam to be recaptured and would preclude adverse environmental effects in other areas where rock would otherwise be quarried to meet public demand.

I find environmental concerns would best be served by completion of quarrying activities at the dam. The injunction on quarrying activities is lifted. The Corps is directed to accomplish its restoration activities as promptly as possible once quarrying activities are completed. In addition, the Corps should stockpile the rock in the construction area behind the dam so as not adversely to impact the stream environment any more than has been accomplished by the present collection of rock.

## III. FISH COLLECTION FACILITY

As if this dispute were not baffling enough, I must also deal with issues of fish passage and "baffles". (Baffles are low

concrete or wood sills across the bottom of a culvert in a pattern that allows for efficient passage of water and debris downstream, and efficient passage of fish upstream.)

Plaintiffs' fisheries expert, Dr. Buell, recommends that the Corps place baffles in the diversion outlet so as to allow passage upstream of the fall and winter salmon and steelhead runs. These are expected to commence in October and to run through May, for a total of 1,560 coho and 3,000 summer and winter steelhead.

A fish collection facility (FCF) is under construction 800 feet downstream of the dam. The purpose of the FCF is to provide a temporary means of recovering upstream fish migrants during the next four years. The FCF is not intended as part of the mitigation for blocked upstream spawning access. That mitigation is provided in full by the Cole M. Rivers Hatchery which has mitigation production goals for coho salmon and steelhead trout.

The FCF will be operated and maintained by the Oregon Department of Fish and Wildlife (ODFW) at its own expense. A contract for the FCF has been awarded by the ODFW and the contractor has commenced work. The FCF is scheduled for completion by the end of January 1988.

■ I will not order the placement of baffles in the diversion outlet. I find the FCF necessary to prevent coho salmon and winter and summer steelhead trout from being blocked from their spawning grounds. Construction of the FCF is not enjoined. I encourage its prompt completion. In addition, I order the Corps to require the ODFW to transport the collected fish upstream to their spawning grounds. I have some doubt that I have authority to order this transportation because of the contractual relationship relationship between the Corps and ODFW and because of the procedural posture of this case. If counsel wish to present argument in this regard, I will consider amending this opinion in connection with the transportation order.

## IV. RESERVOIR CLEARING CONTRACT

On June 18, 1987, a contract was awarded for partial clearing of the reservoir, treatment of sanitary systems within the reservoir and protection of archaeological resources. The area to be cleared encompasses about 770 acres. The Notice to Proceed was not issued and work on the contract has not begun.

Allowing work on the clearing contract to begin will affect fish, wildlife and soils. Prohibiting work on the clearing contract will delay the availability of flood control benefits and increase the cost of the project.

■ The 9th Circuit Court of Appeals identified "significant new information" from the Oregon Department of Fish and Wildlife regarding fish survivability and from the United States Soil Conservation Service regarding turbidity. The Court of Appeals found this new information, which was provided by those agencies during the final stages of the environmental impact study, to be "probably accurate". Allowing the reservoir clearing contract to commence would prevent the decision of the Court of Appeals from having its intended result. Accordingly, I enjoin any work on the reservoir clearing contract.

## V. BALANCING THE EQUITIES

The parties disagree sharply on whether—or how—or both—I am to balance the equities in determining what my injunctive relief is "appropriate". (Plaintiffs' Emergency Motion for Injunctive Relief, pp. 5–8; Plaintiffs' Motion to Strike Evidence [of Monetary Costs and Loss of Jobs]; Defendants' Response ... and Opposition to Motion to Strike Evidence, pp. 17–25). Time does not allow for a discussion here of the tension between Supreme Court cases (*Amoco v. Village of Gambell*, —— U.S. ——, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) and *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)) and Ninth Circuit cases (*Save our Ecosystems v. Clark*, 747 F.2d 1240 (1984), *Thomas v. Peterson*, 753 F.2d 754 (1985)). Suffice it to say that I have balanced the

equities as best I can. The panel will, when the case goes back, engage in *de novo* review and let us all know whether I have balanced correctly or not. And there is time enough for the panel to do so. Under my order, placement of RCC will not commence in any event until late October.

Under the balance I have struck, first in importance is the safety of the children who attend school immediately downstream, and of those who reside nearby. Their lives and property would be in danger if a flood were to ensue, as feared— properly, in my view—by the defendants, if no elevation of the structure were permitted. If the panel wishes to balance differently, it can do so.

Defendants' statements claim large money damages will result from an injunction. No doubt this is partly the case. Further, any injunction will be accompanied by administrative problems. These will be, at best, severe nuisances; at worst, they may produce contractual claims, etc. These are hardly, however, the sort of thing that overweigh the sort of irreparable harm to plaintiffs, and to the public as identified and determined by the Court of Appeals. Its opinion makes it clear that I must fashion some sort of injunctive relief.

As to money damages, careful examination of the written submissions shows that the totals are losses incurred from a total, permanent shutdown. Short term money damages are of a much more modest sort.[4]

As to administrative headaches, these will be troublesome. But the record does not compel a finding that they tip the balance completely in favor of defendants. Under this order, renegotiation of some sort with the successful bidder on the clearing contract will be needed. That bidder may well be entitled to damages, to be be determined in the contract claims tribunal, if a settlement cannot be reached. Under my order, the ODFW contract on the fish collection facility and the archeological contract may both continue. In addition, under my order (especially with its reversal of my earlier order placing a limit on quarrying activity) work to be performed by Ohbayashi would go forward as originally scheduled until sometime in the late fall, i.e. for a period of perhaps 30 to 60 days after weather conditions allow resumption of RCC operations to bring the structure to an elevation of 1,563 feet. It seems likely that the Corps and Ohbayashi will, absent changed legal rulings, face severe administrative and contractual choices by about late November or December of this year.

In summary, however, as to this aspect I find and hold that probable money damages and administrative problems over the short term do not weigh heavily enough to call for a choice in favor of full completion (either with or without operation).

## VI. SUMMARY

In summary, I allow partial completion of the structure to the 1,563 foot level; I allow completion of the quarrying as specified in II. C; I continue the injunction as to the clearing contract; I refuse to require installation of baffles in the diversion outlet, but order the Corps to require ODFW to take fish it traps upstream allowing them to continue to their spawning grounds on Elk Creek. The parties are requested to confer, by phone, on a form of order for me to sign.[5]

The foregoing constitute findings and conclusions, Rule 52, Fed.R.Civ.P.

IT IS SO ORDERED.

---

4. See affidavit of Richard L. Baker, pp. 10, 14–15.

5. Given the limited remand period, and the factual complexities of this project, time does not allow more than a minimal recital of the facts and various aspects I have considered in trying to arrive at injunctive relief which is "appropriate". I hope to be able to issue a supplemental opinion as soon as circumstances allow. In this way, the reviewing panel will be able to determine whether or not I failed to consider relevant aspects in arriving at my ruling.

Further, given the proposed schedule, it may be wise for a status conference to be held about 60–90 days from now (the approximate time of RCC operations, unless they are stayed by the Court of Appeals.) This presents a tricky jurisdictional question, since normally at the expiration of remand, I lose jurisdiction. I solicit suggestions from both sides as to wisdom—and availability—of such a course.

### APPENDIX

On July 2, an Order of limited remand was issued by the Court of Appeals. That Order was not received until July 8. Since then, the following conferences and hearings on the questions of limited injunctive relief have taken place:

July 16, conference with attorneys to arrange for a visit to the site of Elk Creek Dam;

July 18, the entire day was spent visiting Elk Creek Dam so that the Court and counsel could familiarize themselves with the Dam at its current stage of construction;

July 20, hearing on plaintiffs' request for immediate injunctive relief prior to the hearing set for August 14 and discussion of schedule for discovery;

July 22, conference regarding discovery schedule;

July 23, conference regarding bond and argument regarding modification of Order of limited injunctive relief entered on July 22;

July 24, further argument regarding modification of Order of limited injunctive relief entered on July 22 and argument regarding depositions of government employees by plaintiffs;

July 30, further argument regarding depositions of government employees by plaintiffs;

August 3, conference regarding appointment of court expert under Fed.R.Civ.P. 706;

August 10, conference with court expert;

August 11, site visit by court expert and plaintiffs' expert;

August 14, full day hearing on question of limited injunctive relief;

August 26, ½ day hearing on injunctive relief;

August 27, ½ day hearing on injunctive relief;

August 28, hearing of final arguments.

Since July 8 the following Orders were entered:

July 20, Order regarding schedule for discovery;

July 22, Order granting limited injunctive relief; and

July 24, Order modifying July 22 Order and setting bond; August 5, Order appointing court expert under Fed.R.Evid. 706 and allocating costs of the expert between parties.

The following pleadings have been filed with the Court since July 8: Emergency Motion for Injunctive Relief; Plaintiffs' Motion to Strike Evidence; Memorandum in Support of Plaintiffs' Motion to Strike Evidence; and Defendants' Response to Plaintiffs' Request for Injunctive Relief and Opposition to Motion to Strike Evidence. In addition, thirteen affidavits in lieu of testimony were submitted together with an evaluation by the Army Corps of Engineers of four construction alternatives. The affidavits and evaluation comprise 220 pages.