OREGON NATURAL RESOURCES COUNCIL; Oregon Guides & Packers Association, Inc.; Rogue Flyfishers, Inc.; Waterwatch of Oregon, Inc.; and American Rivers, Inc., Plaintiffs–Appellants,

v.

Ernest J. HARRELL, in his official capacity as Commander and Division Engineer, North Pacific Division, Corps of Engineers, United States Department of the Army; John E. Lowe, in his official capacity as Regional Forester, Pacific Northwest Region, Forest Service, United States Department of Agriculture; and D. Dean Bibles, in his official capacity as State Director, Oregon/Washington, Bureau of Land Management, United States Department of Interior; Defendants–Appellees.

OREGON NATURAL RESOURCES COUNCIL; Oregon Guides & Packers Association, Inc.; Rogue Flyfishers, Inc.; Waterwatch of Oregon, Inc.; and American Rivers, Inc., Plaintiffs–Appellees,

v.

Ernest J. HARRELL, in his official capacity as Commander and Division Engineer, North Pacific Division, Corps of Engineers, United States Department of the Army; John E. Lowe, in his official capacity as Regional Forester, Pacific Northwest Region, Forest Service, United States Department of Agriculture; and D. Dean Bibles, in his official capacity as State Director, Oregon/Washington, Bureau of Land Management, United States Department of Interior; Defendants,

and

United States of America, Defendant–Appellant.

Nos. 94–35302, 94–35380.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 31, 1994.

Decided April 21, 1995.

Neil S. Kagan, Portland, OR, for plaintiffs-appellants-cross-appellees.

Vicki L. Plaut, Environment & Natural Resources Div., U.S. Department of Justice, Washington, DC, for defendants-appellees-cross-appellant.

Peter M.K. Frost, National Wildlife Federation, Portland, OR, for amicus curiae.

Before: FLETCHER, NELSON, and RYMER, Circuit Judges.

RYMER, Circuit Judge:

This is a companion case to *Oregon Natural Resources Council v. Marsh (Marsh VII)*, 52 F.3d 1485 (9th Cir.1994).[1] ONRC[2] brought this action against Ernest J. Harrell, the Commander and Division Engineer of the Army Corps of Engineers (Corps), John E. Lowe, the Regional Forester of the United States Forest Service, and D. Dean Bibles, the Oregon/Washington Director of the Bureau of Land Management (BLM),[3] after Corps had completed the environmental review process on the proposed Elk Creek Dam by issuing a Record of Decision (ROD). This case raises issues under both the Wild and Scenic Rivers Act (WSRA), 16 U.S.C. § 1271 *et seq.*, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* As the factual background is fully set out in the *Marsh* opinions, we do not repeat it here.

The principal issue we must decide is whether Corps should have secured the consent under § 7(a) of the WSRA, 16 U.S.C. § 1278, of the Secretaries of Interior and Agriculture (through the BLM and the Forest Service), who administer the Wild and Scenic area of the Rogue River potentially impacted by the dam, before issuing the ROD or proceeding to request congressional appropriations for completing construction. The district court held that Corps had no duty to obtain a § 7(a) determination before issuing the ROD, but that it was obliged to withdraw the ROD once the Secretaries determined that the dam unreasonably diminishes the fish values of the Wild and Scenic portion of the Rogue River and to refrain from further action prior to obtaining their consent. We hold that consent of the administering departments is not required for this project because it is congressionally authorized. Corps is not an authorizing agency in this case; as such, Corps' only obligations under § 7(a) are to submit a report to Congress discussing adverse impacts and to give the Secretaries notice sixty days in advance of its intention to request appropriations, if and when it decides to make such a request. Therefore, we disagree with the district court's order requiring Corps to withdraw its ROD on account of the § 7(a) determination and enjoining Corps from proceeding with

1. *Marsh* was filed in 1985 and challenges compliance by the Army Corps of Engineers with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* The published history of the *Marsh* litigation is substantial: In *ONRC v. Marsh (Marsh I)*, 628 F.Supp. 1557 (D.Or.1986), the district court found that Corps complied with all relevant NEPA provisions. We reversed in *ONRC v. Marsh (Marsh II)*, 832 F.2d 1489 (9th Cir.1987). The district court then enjoined further construction while Corps went back to the drawing board in light of *Marsh II*. *ONRC v. Marsh (Marsh III)*, 677 F.Supp. 1072 (1987). Meanwhile, the Corps petitioned for certiorari on all issues resolved in *Marsh II* except the inadequacy of its cumulative impacts analysis; the Supreme Court, in turn, reversed *Marsh II*. *Marsh v. ONRC (Marsh IV)*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). After remand, *ONRC v. Marsh (Marsh V)*, 880 F.2d 242 (1989), the district court dismissed the action and denied ONRC's request to tear down the partially completed dam. This opinion, reported at *ONRC v. Marsh (Marsh VI)*, 845 F.Supp. 758 (D.Or.1994), is the subject of the related appeal in which we affirm in part, reverse, in part, and remand for a determination of attorneys' fees and further supplementation.

The district court's opinion in *Marsh VI* treated *Harrell* as if it were consolidated. We shall therefore continue to refer to that opinion as *Marsh VI*, even though our disposition of the two appeals is separate.

2. Other parties collectively referred to as "ONRC" are Oregon Guides and Packers Association, Inc., Rogue Flyfishers, Inc., Waterwatch of Oregon, Inc., and American Rivers, Inc.

3. The federal parties are jointly represented on the brief. We therefore refer to them collectively as "Corps" when relating their positions on appeal. As Lowe and Bibles are sued only in their official capacity, we refer to their actions as actions by the Secretaries of Interior and Agriculture, which are the departments charged with administering the Wild and Scenic parts of the Rogue River that are at issue in this case.

the Elk Creek project until the consent of the Secretaries is secured.

However, the district court also found that the Second Environmental Impact Statement Supplement (EISS–2) did not adequately consider new information contained in the § 7(a) determination, as well as in a 1991 report by the Endangered Species Committee of the American Fisheries Society (AFS). As Corps has not appealed this ruling, it will have to prepare an additional supplement or an explanation of why supplementation is not required. In either case the 1992 ROD is rendered inoperative, and we therefore leave in place the order that it be withdrawn.

Since the ROD is no longer effective, for prudential reasons we decline to reach ONRC's challenge to its adequacy. We likewise do not reach ONRC's contention that the district court erred in concluding that the § 7(a) determination is not reviewable, or alternatively, was not arbitrary and capricious. As Corps has no obligation to seek the Secretaries' consent for this project, the § 7(a) determination has no direct effect and acts only as new information which the district court has already held the Corps must consider.

Finally, ONRC appeals the denial by the district court of two forms of injunctive relief. The district court declined to mandate destruction of the dam or its spillway, which ONRC argues is necessary for salmon and steelhead trout survival. We affirm, as the court was within its discretion to deny such extraordinary relief on the record adduced. The court also refused to order preparation of a supplemental environmental impact statement (EIS), which we also affirm because the fact that new information is significant enough to require consideration does not necessarily mean that it is significant enough to require a supplemental EIS.

I

In 1962, Congress authorized the Corps to construct a system of three dams in Oregon,

known as the Rogue River Basin Project. Two of the dams have been completed and are operational. The proposed Elk Creek dam was about one-third completed when further construction was enjoined as a result of our remand in *Marsh II*. *Marsh III*, 677 F.Supp. 1072 (D.Or.1987).

Elk Creek is a tributary to the Rogue River, about 55 miles upstream from a part of the river Congress designated as a "Wild and Scenic River" under § 3 of the WSRA, 16 U.S.C. § 1274(a)(5). Elk Creek supports wild salmon and steelhead trout runs, which migrate through the Wild and Scenic segment of the Rogue. Congress included the Rogue River in the Wild and Scenic Rivers System in 1968 to protect and enhance its "outstandingly remarkable" values, including the wild salmon and steelhead.

In 1971, Corps filed the final EIS with the Council on Environmental Quality (CEQ) for the Elk Creek portion of the project. The first supplemental EIS (EISS–1) was prepared in 1980, and Corps approved construction of the Elk Creek Dam in 1982. Following appropriation of construction funds by Congress in 1985, ONRC and others brought the *Marsh* action for alleged violations of NEPA. The district court ordered a second supplement in 1990, and in 1991 the Corps issued a final supplemental EIS (EISS–2). In December of 1991, ONRC asked the Corps to secure a § 7(a) determination from the Secretaries of Interior and Agriculture, and on January 16, 1992 ONRC asked the Secretaries to determine whether the dam would unreasonably diminish the values of the Rogue River pursuant to § 7(a). Harrell issued the ROD on January 24, 1992, reflecting the Corps' decision to go forward with construction of the dam, and adopting the "No Conservation Pool" operating alternative, where the dam would be used only for flood control, with the possibility of water conservation use at some time in the future pursuant to new environmental impact studies.

In November, 1992 the BLM and Forest Service jointly issued a § 7(a) determination finding that

> [t]he unfinished Elk Creek Lake dam results in unreasonable diminishment to the anadromous fisheries resource because of impediments to migration and some loss of

spawning and rearing habitat. The condition of diminishment will continue until such time as successful fish passage is assured. In the NCP [No Conservation Pool] Alternative passage is assured only in concept. When the Corps of Engineers is able to complete and implement a system which effectively provides fish passage, the condition would not be considered unreasonable diminishment.

It concluded that

[t]he problem of fish passage at the dam causes the existing situation and the NCP Alternative, until fully mitigated, to unreasonably diminish the fisheries resource of the Rogue W & SR. In addition, elimination of high quality habitat immediately above the dam decreased potential for recovery of wild coho stocks in the Rogue River.

In light of this determination, ONRC demanded that Corps withdraw the ROD, but Harrell refused. This action ensued.

On cross-motions for summary judgment, the district court held that the § 7(a) determination contains significant information that has not been considered adequately by Corps in the NEPA process, and remanded for Corps to consider information on extirpation of the coho and steelhead runs in the No Conservation Pool operating mode, the relationship between the potential extirpation of the Elk Creek fisheries and the viability of the Rogue River fisheries, fish passage and how it will affect the summer fisheries, feasibility of passage, spawning and rearing habitat in the area above the dam, and negative interactions of hatchery fish with native stocks. No appeal was taken from this part of the court's decision. ONRC appeals the district court's conclusion that the Corps did not have to obtain the Secretaries' consent before issuing the ROD; its rulings on the § 7(a) determination; its failure to hold that EISS–2 and the ROD violate NEPA in certain respects; and its denial of ONRC's requests for an order that Corps prepare an-

other supplement and tear the dam down.[4] Corps cross-appeals the court's order that it take no action before securing the Secretaries' consent.

## II

ONRC argues that Corps violated the WSRA by approving the construction of Elk Creek Dam prior to a determination of the dam's impacts on the Wild and Scenic segment of the Rogue River as required by § 7(a). It reads § 7(a) as prohibiting federal agencies from authorizing the construction of any water resources project on a tributary that will unreasonably diminish a Wild and Scenic River's values, as determined by the Secretary charged with its administration. Corps, on the other hand, argues that its ROD selecting the "No Conservation Pool" Alternative is neither final agency action that is judicially reviewable, nor "assistance" within the meaning of the WSRA because the Act reserves to Congress, not the resource agencies, the decision whether to build a purely federal water resources project.

## A

■ In its cross appeal, Corps contends that the district court erred in concluding that the issuance of the ROD was reviewable final agency action as the formal record of the decision to implement the chosen alternative (the No Conservation Pool alternative). *Marsh VI*, 845 F.Supp. at 771. However, we held in *Friedman Brothers Investment Company v. Lewis*, 676 F.2d 1317, (9th Cir.1982), that a federal agency's decision that a bus yard qualified for a categorical exclusion from NEPA was reviewable final agency action even though it had not made a final funding commitment. *Id.* at 1319–20. Moreover, it is more pragmatic to review Corps' action at the end of the agency's decisionmaking process than after Congress has appropriated funds. *See Dietary Supplemental Coalition, Inc. v. Sullivan*, 978 F.2d 560, 562 (9th Cir.1992) (stating that the "finality element must be interpreted in a 'pragmatic' and 'flexible' manner."), *cert. denied*, ——

---

**4.** National Wildlife Federation filed a brief as amicus curiae in support of ONRC's position on the issue of whether the Corps must secure the consent of the Secretary of Agriculture before issuing a record of decision to construct the Elk Creek Dam.

U.S. ——, 113 S.Ct. 2333, 124 L.Ed.2d 245 (1993). Since judicial review in this case "will not interfere with any ongoing agency decision-making process," we hold that the district court had jurisdiction over this action. *Friedman,* 676 F.2d at 1319.

**B**

■ Section 7(a) provides that no agency shall "assist by loan, grant, license, or otherwise" in the construction of a water resources project with an adverse effect on river values; that such prohibition shall not preclude licensing of or "assistance" to developments above a Wild and Scenic River area which will not unreasonably diminish its values; and that no agency shall recommend authorization of, or request appropriations to begin construction of, any such project that would have an adverse effect on the values for which the river was designated as wild and scenic, without advising the Secretary.[5] The first two sentences thus restrict agencies when they act to assist in the construction of a project; the third sentence establishes procedural requirements when they recommend authorization or request appropriations for such projects. Neither "assist" nor "assistance" is defined in the Act.

Under ONRC's view of § 7(a), federal agencies may not "authorize construction" before notifying the resource agency, which will then consent to issuance of an "authorization" only upon determining that the effects will not diminish relevant values of the Wild and Scenic River. The Corps' ROD does not, however, "authorize construction" of the Elk Creek Dam. Only Congress can do that. *See* 33 U.S.C. § 701s (Corps' authority to implement projects without congressional authorization and appropriation limited to $5 million).

ONRC posits that because CEQ regulations require the Corps to issue a "record of decision" before construction of the dam can begin,[6] the ROD constitutes an "authorization ... required by an agency ... of the Federal Government before ... construction of a water resources project" under 36 C.F.R. 297.3. Section 297.3 defines "Federal assistance" as "any assistance by an authorizing agency" including "[a] license, permit, or other authorization granted by the Corps," *id.* § 297.3(b), and "[a]ny other license, permit, or authorization which may be required by an agency or Department of the Federal Government before, during, or after construction of a water resources project." *Id.* § 297.3(c). As the Corps has no authority to "authorize" construction of a dam of this magnitude, however, we do not see how its decision to adopt the No Conservation Pool Alternative can be an "authorization" which, in turn, amounts to "assistance" requiring prior consent by the Secretaries. If it were, it would mean that a required part of the environmental impact review process is "assistance" to that process; and if that were the case, it would mean that no work could

**5.** WSRA § 7(a), 16 U.S.C. § 1278(a), provides in relevant part:

... no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration. Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation of a river as a component of the National Wild and Scenic River System. No department or agency of the United States shall recommend authorization of any water resources project that

would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration, or request appropriations to begin construction of any such project, whether heretofore or hereafter authorized, without advising the Secretary of the Interior or the Secretary of Agriculture, as the case may be, in writing of its intention so to do at least sixty days in advance, and without specifically reporting to the Congress in writing at the time it makes its recommendation or request in what respect construction of such project would be in conflict with the purposes of this chapter and would affect the component and the values to be protected by it under this chapter....

**6.** The regulations provide that until an agency issues an ROD, no action shall be taken which would have an adverse environmental impact or limit the choice of reasonable alternatives. 40 C.F.R. § 1506.1(a); *see* 40 C.F.R. § 1505.2.

begin on any part of the NEPA process, if a Wild and Scenic River is implicated, without the Secretaries' consent. To read § 7(a) in this way would not only turn the review process inside out, but would effectively render the third sentence—providing for notice of intent to seek appropriations to begin construction of a project with adverse effect as determined by the Secretaries—superfluous.

ONRC faults the district court for having considered § 7(a)'s third sentence at all, because the ROD neither recommends authorization of the dam nor requests appropriations to build it. By its terms, the third sentence applies when a federal agency intends to recommend authorization or request appropriations to begin construction of a water resources project. While ONRC's view is correct so far as it goes, it does not thereby follow that the first two sentences do apply.

No loan, grant or license is involved in Corps' ROD, so the only way the first two sentences could apply is if Corps could be said to "assist ... otherwise" than by loan, grant or license in the construction of the dam. The accepted meaning of "assist" is "to give support, aid, or help to." *Webster's Unabridged Dictionary of the English Language* (Portland House 1989). Likewise, "loan, grant or license" connotes an enabling act by an authorizing agency. Thus, the normal sense of "assist by loan, grant, license or otherwise" is action by one entity to make it possible for another entity to engage in construction affecting a Wild and Scenic River. As Corps is the only entity involved in issuing a record of decision, and the only entity involved in constructing the dam (subject to congressional authorization and appropriation), it strains logic as well as language to conclude that by such action it can "assist" itself.

Contrary to ONRC's view that the regulations meld the requirements of § 7(a)'s first three sentences by prohibiting "assistance," we believe they are consistent with the Corps' interpretation that § 7(a) is concerned with two different types of projects: those that are federally assisted on the one hand (governed by the first two sentences), and those that are congressionally authorized on the other (governed by the third sentence). Section 297.3 defines "construction" as "any action carried on with Federal assistance." 36 C.F.R. § 297.3. "Federal assistance," in turn, "means any assistance by an authorizing agency" including a license, permit or other authorization granted by the Corps. *Id.* § 297.3(b). Section 297.4 proscribes issuing a "license, permit, or other authorization" for a federally assisted water resources project without a § 7(a) determination. The regulations thus have to do with assistance by means of authorization. They do not suggest that the Corps provides such "assistance" by issuing a record of its own decision to adopt a particular alternative operating mode subject to congressional appropriation.

■ Taken as a whole, the most coherent reading of § 7(a) and its implementing regulations requires that a federal agency giving assistance to others to enable them to take action affecting a Wild and Scenic River must comply with the procedure set out in the first two sentences, whereas an agency taking action directed at Congress, which may authorize or appropriate funds for a project affecting a Wild and Scenic River, must comply with the procedures set out in the third sentence.

This construction comports with such legislative history as there is and squares with the evident intent underlying § 7(a). As Rep. Wayne Aspinall, the Chair of the House Committee on Interior and Insular Affairs, explained:

> If the Corps of Engineers, for instance, wants to put a development in on any of [these rivers], all it has to do is to advise the Secretary of the Interior ahead of time and inform the Congress what the effects of its development will be. Then if Congress says OK, OK it is.

114 Cong.Rec. 26590 (Sept. 12, 1968); *see also* 114 Cong.Rec. 28,313 (Sept. 26, 1968) (conference report on bill, suggesting non-federal projects fall under first half and purely federal ones receive congressional review); *id.* at 3811–12 (House Report discussion of the parts of § 7(a)). The part of the House Report relied on by ONRC is not to the contrary; indeed it supports construing

§ 7(a) as distinguishing between federal projects (which are to be reviewed by the administering departments and Congress equally) and actions by a federal agency (which may not make loans or grants or provide other forms of assistance without the administering department's blessing):

> Designation [of a river] as [a] component[ ] of the National Scenic Rivers System means ... that no Federal water project should be constructed on [a Wild and Scenic River] without being thoroughly reviewed both in the Departments and in Congress, that no Federal agency should make any loans or grants for or give any other form of assistance to such a project without assurance from the head of the Department administering the scenic river that the project will not have a direct and adverse effect....

H.R.Rep. No. 1623, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 3801, 3807. Thus, it appears that Congress intended to require the appropriate Secretary's consent where a federal agency is the authorizing agency, and Congress will not be involved, but not where Congress itself is the decisionmaker. When Congress is in the driver's seat, it must have intended for the administering Secretary to be informed and to provide input—but not to have a veto. The requirement of notification within sixty days is designed to provide administering secretaries with sufficient time to voice to Congress any concerns they have about the construction prior to congressional action, and Congress makes a determination based on this advice and on the statutorily required report by the Corps on the project's potential harm to the Wild and Scenic River. This makes sense, because otherwise the administering Secretaries would effectively have power to prevent an agency such as Corps, with a congressional mandate to build a dam, from reporting to Congress and requesting appropriations. It is implausible that Congress would have conferred such authority on the Executive when Congress has the ultimate responsibility for authorizing construction and appropriating funds.

In this case, Corps was not acting to license, permit or otherwise authorize a third party to take action, but rather was acting to record its own choice of operating mode for a congressionally authorized dam. As such, the ROD was not "assistance" within the meaning of WSRA § 7(a). Accordingly, the district court correctly held that the Secretaries' prior consent was not required, but incorrectly concluded that Corps could not proceed with the Elk Creek project, presumably including the issuance of a new record of decision, report or request for appropriations to Congress, without the Secretaries' consent. So far as this project is concerned, § 7(a) and the Secretaries' determination (to the extent it, or any future determination, finds a direct and adverse effect on the values for which the Rogue was designated a Wild and Scenic River) only constrains the Corps from requesting appropriations without (a) advising the Secretaries of its intention to seek funding, sixty days in advance, and (b) reporting to Congress in what respects construction would conflict with the purposes of WSRA and would affect the values to be protected.

### III

Even though it believes that Corps should be bound by the Secretaries' determination, ONRC nevertheless submits that the BLM and Forest Service determination of the Elk Creek Dam's impacts on the Wild and Scenic part of the Rogue River was arbitrary and capricious because it found the elimination of spawning and rearing habitat, alone, will not unreasonably diminish the fisheries resource. In order to get there, however, ONRC urges that we reverse the district court's decision that a § 7(a) determination is unreviewable, as it is committed to the Secretaries' discretion.

Because we conclude that the ROD was not "assistance" within the meaning of § 7(a), the determination has no effect on the parties except to the extent that the district court ruled that it contains new information which must be considered by the Corps. Neither that ruling, nor its scope, has been appealed. Therefore, whether the BLM and Forest Service concluded correctly or incorrectly that the dam will not unreasonably diminish the fisheries resource if the Corps is

able to complete and implement a system which effectively provides fish passage is immaterial to any issue remaining in the case. On remand, Corps will no doubt take seriously the new information, the Secretaries' conclusions, and the views of ONRC about the impact on Elk Creek's spawning and rearing habitat. However, it is unnecessary for us to reach any of these issues.

## IV

ONRC continues its NEPA challenge, begun in *Marsh*, on the adequacy of EISS-2. ONRC claims that EISS-2 fails to disclose adequately the current need for the dam, and fails to disclose and discuss adequately possible mitigation measures. The district court did not address either claim directly, perhaps because it believed it had disposed of the NEPA issues remaining after remand. As explained in *Marsh VII*, 52 F.3d 1485, the remand was limited to evaluation of the cumulative impacts of the Elk Creek Dam along with Applegate and Little Lake Dams on the Rogue River basin. However, as the district court recognized, the limited nature of the remand did not immunize Corps from complying with NEPA in other respects.

## A

ONRC argues that Corps' discussion of mitigation should, but did not, indicate how well the measures that might be used would work. In particular, it maintains that Corps, in addition to its discussion of mitigation through hatchery replacement, should have identified protection and enhancement of natural anadromous fish habitat elsewhere in the basin as a possible way of mitigating the loss of habitat due to the dam. During the comment period, exploration of this option was suggested by the Department of the Interior and Oregon Department of Fish and Wildlife. The Department of Interior specifically observed that while mitigation by way of the hatchery "would be consistent with the initial planning objectives for the Rogue River Basin Project, it is not consistent with the present management emphasis for wild stocks in the Rogue River Basin."

In the EISS-2 Appendix, Corps responded to these comments by stating that it had been determined at the time the first of the three dams was built that mitigation would be through hatcheries, and that resource agencies had agreed. Further, Corps pointed to the cost of building the hatchery and asserted there was no justification for the cost of other off-site mitigation.

ONRC faults Corps for its failure to respond more thoroughly to the suggestion that preservation and enhancement of the fish spawning areas would be better than the hatchery measure, in light of changed scientific perspectives on how best to treat the Rogue River basin fish issues and the actual effects of hatchery fish. Although Corps argues that the mitigation discussions in EIS and EISS-1 were adequate, that no additional mitigation need was identified as a result of the cumulative impacts discussion, and that it is mitigating through hatcheries and its trap and haul program, it represents that mitigation "is continuing to be discussed, as the federal and state agencies work together to design and evaluate fish passage options."

The district court's order already requires Corps to consider the new information provided in the Secretaries' § 7(a) determination and the report by the Endangered Species Committee of the AFS. The § 7(a) determination states that "updated science has shown there are significant differences between hatchery and wild stocks" and indicates that the hatchery may be inadequate mitigation for the loss of habitat. Analyses of these documents on remand will require Corps to consider the extent to which current programs and its plan for mitigation under the No Conservation Pool Alternative will provide adequate mitigation. The consideration required by the district court order will necessarily entail consideration of other mitigation alternatives which address fish passage options and spawning and rearing habitat. *See Marsh VI*, 845 F.Supp. at 768 (explaining the significance of the new information contained in the § 7(a) determination and AFS report pertaining to spawning and rearing habitat and fish passage).

## B

ONRC also contends that because circumstances have changed significantly over the

past thirty years, and the need for flood control is no longer as important as it once was, EISS–2 fails accurately to specify the current need for the dam. It points to a 1982 report from the Comptroller General which recommended that Corps recalculate the expected benefits from the dam in light of changes in the growth rate and greater restrictions on development along the river. Regardless of whether EISS–2 should have discussed the current need in more detail, we cannot say that, fairly read, information in the Comptroller General's report is not significant new information.

As with the other new information Corps is to consider on remand, Corps must make "a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information" whether supplementation is necessary, and if not, explain why this information does not merit supplementation. *Marsh IV*, 490 U.S. at 373–78, 109 S.Ct. at 1859–61.[7]

### V

ONRC expands its NEPA challenge in this action to the ROD, contending that it does not state whether all practicable mitigation measures had been adopted and if not, why not, and that it fails to adopt a monitoring and enforcement program as required by 40 C.F.R. § 1505.2(c). We do not reach this issue because the district court's order withdrawing the 1992 ROD moots the question. A record of decision comes at the end of the pre-decision, environmental review process and is intended to make public the agency's decision, to identify the alternatives considered and which are environmentally preferable, to state whether all practicable means to avoid or minimize environmental harm have been adopted, and to summarize the monitoring and enforcement program that has been adopted. *Id.* § 1505.2. As the environmental impact statement supplement upon which the 1992 ROD was based must be supplemented in light of our decision in *Marsh VII*, that record of decision can no longer be

taken as the Corps' operative decision. Accordingly, we must decline to give an advisory opinion as to its sufficiency. As with the new information on the table, however, we assume the Corps will carefully consider these claimed deficiencies.

### VI

#### A

■ ONRC asked the district court to enter an order enjoining Corps either to demolish the structure or to remove the dam's spillway section. It claims both remedies are warranted, since eliminating the obstruction is the only way to prevent Elk Creek's wild anadromous fish runs from being lost. While recognizing that ONRC made a compelling case for doing something about the partially-completed dam to save the fisheries, the district court believed it was appropriate to give the agencies with expertise an opportunity to respond to the new information on remand before ordering the mandatory relief ONRC sought.

■ Mandamus may be granted when "(1) the plaintiff's claim is clear and certain; (2) the duty is 'ministerial and so plainly prescribed as to be free from doubt'; and (3) no other adequate remedy is available." *Fallini v. Hodel*, 783 F.2d 1343, 1345 (9th Cir. 1986) (citations omitted). The extraordinary remedy of mandamus lies within the discretion of the trial court, even if the three elements are satisfied. *Id.* Whether each element of the mandamus test is satisfied is a question of law reviewed de novo. *Id.* When the effect of a mandatory injunction is the equivalent of mandamus, it is governed by the same standard. *Id.* (citing *Miguel v. McCarl*, 291 U.S. 442, 452, 54 S.Ct. 465, 467, 78 L.Ed. 901 (1934)).

Assuming for purposes of this appeal that equitable relief of the sort requested is available, and that ONRC can meet the first two prongs, there is no showing of the lack of other adequate remedy. The district court remanded for the Corps to consider new

---

7. ONRC requests that we order Corps to prepare a new supplement in response to this new information. Although we decline to do so, we note that supplementation was ordered on other

grounds in our opinion today in *Marsh VII*, 52 F.3d 1485, and Corps may choose to address the new information in that supplement.

information on fish passage, habitat, and mitigation, among other things. Nor does either party discuss the impact of the act of taking down the dam itself. Even though labeled as a request for permanent injunctive relief, the remedy ONRC seeks is essentially temporary in nature: an injunction against leaving the partially-completed dam in place until completion of the decision-making process. Even without a fully developed record, it is obvious that destruction, and possible reconstruction, of any portion of the dam is likely to have environmental consequences.

In the meantime, Corps has instituted a trap and haul program to help sustain the wild coho. Although there is no assurance as to how successful it will be, there also is no showing that it is likely to be so unsuccessful in the short term that the dam should be torn down forthwith. ONRC's evidence pertains mainly to the long term hazards of the dam and the ineffectiveness of the trap and haul program as a long term solution. However, since the remedy sought is removal of the dam or spillway until the decision-making process is completed, evidence that the dam will destroy habitat and possibly extirpate the fish eventually does not compel demolition of the structure now.

We cannot say that the district court abused its discretion in declining the extraordinary remedy of mandating destruction of the partially constructed dam. While ONRC demonstrated some flaws in the decision-making process, the district court was within its discretion to allow Corps to address those concerns on remand before ordering the relief requested.

B

ONRC argues that the district court erred in declining to order Corps to prepare a third supplement. The regulations require a supplemental EIS if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). ONRC argues that since the district court found that the AFS report and the § 7(a) determination "contain significant information that has not adequately been considered" in the NEPA process, it

was bound to order supplementation. The court's finding, however, does not compel this relief. On remand, the Corps will have to take a hard look at the proffered new information; it may find "that the new and accurate information contained in the documents was not significant and that the significant information was not new and accurate." *Marsh IV*, 490 U.S. at 385, 109 S.Ct. at 1865. That decision, in turn, can be reviewed for whether it was arbitrary and capricious. The court was within its discretion in denying the requested relief.

VII

We conclude that Corps had no obligation to secure the prior approval of the Secretaries of Interior and Agriculture under § 7(a) of the WSRA before issuing its record of decision, and affirm on this issue. We reverse the district court's holding that Corps may not proceed with the Elk Creek project until the consent of the administering Secretaries is secured, and therefore vacate that portion of its order; we affirm the district court's order that the ROD should be withdrawn, but on the ground that the ROD has been rendered inoperative by our opinion today in *Marsh VII*. In light of these conclusions, ONRC's appeal of the district court's dismissal of the actions against Bibles and Lowe and its challenge to the adequacy of the ROD are dismissed as moot. We reverse to the extent that the court did not also require Corps to consider new information having to do with the current need for the dam. We affirm the denial of injunctive relief and the refusal to order preparation of a third supplemental EIS.

Each side shall bear its own costs on appeal.

APPEAL DISMISSED IN PART; AFFIRMED IN PART; REVERSED IN PART; and VACATED IN PART.