52 F.3d 1485
 40 ERC 1872, 25 Envtl. L. Rep. 20,885,
95 Daily Journal D.A.R. 8755
 OREGON NATURAL RESOURCES COUNCIL; Rogue Flyfishers; Rogue
River Guides Association; and Oregon Guides and
Packers Association, Inc., Plaintiffs-Appellants,
v.
John O. MARSH, Jr., in his official capacity as Secretary of
the United States Department of the Army, and Elvin R.
Heiberg, III, in his official capacity as Chief of Engineers
of the United States Department of the Army, Defendants-Appellees.
 Nos. 93-36122, 94-35370.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 31, 1994.
Decided April 21, 1995.
As Amended on Denial of Rehearing June 29, 1995.
 
 Neil S. Kagan, Portland, OR, for plaintiffs-appellants.
 Vicki L. Plaut, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before: FLETCHER, D.W. NELSON, and RYMER, Circuit Judges.
 Opinion by Judge FLETCHER; Partial Concurrence and Partial Dissent by Judge RYMER.
 FLETCHER, Circuit Judge:
 The plaintiffs appeal the district court's dismissal of their suit under the National Environmental Policy Act (NEPA), 42 U.S.C. Sec. 4321 et seq. The district court determined that a Second Environmental Impact Statement Supplement (EISS-2), prepared by the Army Corps of Engineers ("Corps") in response to our decision in ONRC v. Marsh, 832 F.2d 1489 (9th Cir.1987) ("Marsh II "), rev'd and remanded in part, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), had taken a "hard look" at the cumulative environmental effects of the proposed Elk Creek Dam. The plaintiffs also appeal the district court's denial of their request for attorneys fees pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. Sec. 2412. We have jurisdiction, and we reverse in part and affirm in part.
 
 
 1
 * In 1962, Congress authorized the Corps to construct three dams in southern Oregon's Rogue River Basin. Flood Control Act of 1962, Pub.L. No. 87-874, Sec. 101, 76 Stat. 1173 (1962). Two of the projects, the Lost Creek and Applegate River Dams, have been completed. The subject of this litigation is the third dam, the Elk Creek Project, which has been standing uncompleted since 1987 at one-third of its designed height.
 
 
 2
 Elk Creek is a tributary of the Rogue River and is located upstream of the segment of the Rogue River that Congress has designated as Wild and Scenic under the Wild and Scenic Rivers Act (WSRA), 16 U.S.C. 1271, et seq. Elk Creek supports the wild coho salmon and steelhead trout runs which pass through the Wild and Scenic portion of the Rogue River. The river's wild coho and summer steelhead populations have declined since 1968, and the species are now in danger of extinction due to actual or threatened destruction of their spawning and rearing habitat.
 
 
 3
 In 1982, the Corps approved construction of the Elk Creek Dam based on a 1980 Environmental Impact Statement Supplement (EISS-1). The Oregon Natural Resources Council ("ONRC")[1] brought this action under NEPA in October 1985 to prevent the Corps from building the dam, alleging in part that the Corps had violated NEPA by failing to prepare adequate documentation of the environmental effects of the proposed Elk Creek Dam. In its first look at the case, the district court held that the Corps had complied with NEPA in all respects and denied ONRC's request for an injunction to stop construction of Elk Creek Dam. ONRC v. Marsh, 628 F.Supp. 1557, 1563-69 (D.Or.1986) ("Marsh I ").
 
 
 4
 We reversed in Marsh II, in part because EISS-1 had failed to discuss the cumulative impact of the Lost Creek, Applegate, and Elk Creek dams taken together. 832 F.2d at 1498. Accordingly, we remanded to the district court for entry of appropriate injunctive relief. The district court enjoined further construction of the dam while the Corps prepared a new EISS. ONRC v. Marsh, 677 F.Supp. 1072, 1078 (D.Or.1987) ("Marsh III "). Although the Corps sought and obtained certiorari to the United States Supreme Court, it did not petition for review of our holding that it had failed to discuss the cumulative impacts of the three Rogue River dams. Thus, although the Supreme Court reversed Marsh II on the issues for which certiorari was granted, Marsh v. ONRC, 490 U.S. 360, 369-85, 109 S.Ct. 1851, 1857-65, 104 L.Ed.2d 377 (1989) ("Marsh IV"), our decision that EISS-1 had failed to discuss cumulative impacts was left intact. See ONRC v. Marsh, 880 F.2d 242, 242 (9th Cir.1989) (remand to the district court after Marsh IV ) ("Marsh V").
 
 
 5
 The Corps issued EISS-2 in May 1991. EISS-2 considers the environmental effects of a No Action Alternative, under which the Corps would not complete construction of the Elk Creek Dam, and of constructing and operating the dam under three different operating alternatives. Two of the operating alternatives, the Full Pool Alternative and the Minimum Pool Alternative, would involve using the dam for water conservation purposes as well as for flood control. Under the third, No Conservation Pool Alternative, the dam would be used only for flood control, with the possibility of conservation use at some time in the future pursuant to new environmental impact studies. EISS-2 recommends completion of construction under the No Conservation Pool Alternative.
 
 
 6
 During the public comment period, ONRC criticized the Corps' draft of EISS-2 in part for failing to discuss adequately the cumulative impacts of the dams. Nevertheless, on January 24, 1992, Ernest Harrell, the Corps' Division Engineer, issued the Corps' Record of Decision approving construction of the dam under the No Conservation Pool Alternative. Subsequently, on July 22, 1992, the Corps moved to dissolve the outstanding injunction against further construction, arguing that EISS-2 discussed cumulative environmental impacts in accordance with this court's mandate in Marsh II.
 
 
 7
 Meanwhile, ONRC asked the Secretaries of the Forest Service and Bureau of Land Management to issue a determination under section 7(a) of the Wild and Scenic Rivers Act. See 16 U.S.C. Sec. 1278(a). On November 5, 1992, the Secretaries issued a joint determination that, due to reduction of the coho and steelhead's spawning and rearing habitat and the impediment to the fishes' migration, the uncompleted Elk Creek Dam unreasonably diminishes the values for which the Wild and Scenic portion of the Rogue River was so designated. The Secretaries determined, however, that the diminishment of the Wild and Scenic values of the Rogue River would not be unreasonable were fish passage assured.
 
 
 8
 In response to the Secretaries' determination, ONRC sought modification of the injunction issued in Marsh III, asking the district court to order Corps either to demolish the dam or to remove the dam's spillway on the grounds that the dam, although incomplete, unreasonably diminishes the anadromous fish populations of the Rogue River. ONRC also alleged that Corps had violated NEPA in several regards, including failing to comply with this court's mandate that EISS-2 analyze cumulative environmental impacts. ONRC's claims under WSRA and claims of additional NEPA violations were filed as part of a new action, and we discuss them separately in an opinion filed today. ONRC v. Harrell, 52 F.3d 1499 (9th Cir.1995).
 
 
 9
 Discussing the remaining issue in Marsh, EISS-2's analysis of cumulative environmental impacts, the district court held that EISS-2 had taken a "hard look" at the cumulative effects of the Rogue River Basin Projects on streamflows, water temperature and turbidity, fisheries, wildlife, local recreation, and the local economy by employing an incremental approach under which the Corps described the base, pre-dam conditions; the effects of adding the Lost Creek and Applegate River Dams; and, finally, the predicted effects of Elk Creek Dam under each of the four proposed alternatives. ONRC v. Marsh, 845 F.Supp. 758 (D.Or.1994) ("Marsh VI"). Accordingly, the district court dismissed the Marsh action and refused either to order the destruction of the dam or the removal of its spillway, or to require the Corps to prepare a new EISS. The district court also denied ONRC's request for attorneys fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. Sec. 2412, on the ground that the Corps' position in Marsh I and Marsh II, that EISS-1 included an adequate cumulative impact analysis, although erroneous, was substantially justified.
 
 II
 
 10
 We review de novo the district court's determination that EISS-2 complied with NEPA. Marsh II, 832 F.2d at 1492. Our role is to assure that the Corps took a "hard look" at the environmental consequences of its decision to complete the Elk Creek Dam under the No Conservation Pool Alternative. Marble Mountain Audubon Soc'y v. Rice, 914 F.2d 179, 182 (9th Cir.1990). Although "we must defer to 'the informed discretion of the responsible federal agencies,' " Marsh IV, 490 U.S. at 377, 109 S.Ct. at 1861 (quoting Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)), and are not to " 'fly speck' environmental impact statements," Lathan v. Brinegar, 506 F.2d 677, 693 (9th Cir.1974), we will reverse an agency's decision where it is contrary to procedures required by law, 5 U.S.C. Sec. 706(2)(D); Marble Mountain Audubon Soc'y, 914 F.2d at 182, or where it is arbitrary or capricious, 5 U.S.C. Sec. 706(2)(A); Greenpeace Action v. Franklin, 14 F.3d 1324, 1330-32 (9th Cir.1992).
 
 
 11
 * ONRC argues that, although the Corps has discussed the cumulative environmental effects of the three Rogue River Basin projects to some extent, the scope of EISS-2's cumulative impacts analysis is too narrow. The Corps argues that our decision in Marsh II required it only to discuss the cumulative impacts on two specific water quality factors--temperature and turbidity--and their effects on fish and fisheries production. The Corps maintains that "the scope of [EISS-2] was properly limited to an evaluation of these specifically identified issues of water quality" because they were the only factors explicitly mentioned by this court in Marsh II.
 
 We wrote in Marsh II:
 
 12
 [ONRC] contends that the Corps unreasonably limited the scope of [EISS-1] by failing to consider the cumulative effects of all three dam projects, Lost Creek Dam, Applegate Dam, and Elk Creek Dam, the first two of which already have been completed.
 
 
 13
 . . . . .
 
 
 14
 We disagree with the district court that the Corps took a hard look at the cumulative environmental impacts. Plaintiffs point out two examples of the Corps' failure to consider the cumulative impacts. First, although [EISS-1] conceded that the overall basin project would increase the turbidity of the Rogue River, it concluded that there would be no major adverse effect on fish production from increased turbidity. In reaching this conclusion, however, it considered only the turbidity created by the individual project. Similarly, in response to a comment made by the United States Environmental Protection Agency suggesting that the EIS should discuss the effects of Lost Creek Dam on downstream water quality, the Corps responded that the Elk Creek EIS was not the proper place to discuss the effects of Lost Creek Lake. Insofar as the effects of the Lost Creek Dam were necessary to a complete presentation of the cumulative impact of construction of Elk Creek Dam, we disagree.
 
 
 15
 The synergistic impact of the project should be taken into account at some stage, and certainly before the last dam is completed.
 
 
 16
 832 F.2d at 1497-98.
 
 
 17
 We agree with ONRC that the Corps has read our mandate too narrowly. We mentioned the factors of turbidity and downstream water quality as "examples" demonstrating the Corps' failure to discuss cumulative impacts at all. Having noted two instances where the Corps demonstrated its unwillingness in EISS-1 to discuss anything other than the effects of the Elk Creek Dam, considered in isolation, we held:
 
 
 18
 While a separate EIS is not required, the Corps should consider the impact of the Elk Creek Dam in conjunction with Lost Creek Dam and, if appropriate, Applegate River Dam. The Corps is building Elk Creek Dam in an area that already has two dams. It must consider the area as it finds it and take into consideration the cumulative impact of the basin project.
 
 
 19
 Id. On remand, the Corps should have discussed, at a minimum, those areas of environmental impact that were discussed in EIS and EISS-1 and analyzed how those factors would be affected by the Elk Creek Dam, in combination with the Lost Creek and Applegate River Dams.
 
 B
 
 20
 The Corps maintains that, even though it believed that our decision in Marsh II required it to discuss cumulative impacts only with regard to water temperature and turbidity, its erroneously narrow interpretation of our remand did not detrimentally affect the scope and quality of EISS-2's cumulative impact analysis. We disagree. The Corps' responses to comments submitted during the public comment period demonstrate that the Corps' narrow interpretation of our mandate in Marsh II was not merely a litigation position, but also defined the scope of the Corps' analysis. Rather than examine on its own initiative the cumulative impacts of the Rogue River Basin projects with regard to each of the environmental factors considered in EIS and EISS-1, the Corps included within the scope of its cumulative impact analysis only the issue of water quality, measured only in terms of temperature and turbidity; discussed additional factors only if they were raised as concerns during the scoping process; and then refused to broaden the scope of its analysis when concerns were raised during the public comment period.
 
 
 21
 For example, ONRC submitted a comment suggesting that the scope of EISS-2 was too narrow and that the Corps should discuss additional environmental factors, including water quality parameters other than temperature and turbidity. The Corps responded that "[t]he scope of [EISS-2] was determined through a public scoping process which identified the significant issues to be addressed. The elements of the environment which you mention were not identified as significant issues and were therefore not included in the scope." When the Oregon Department of Environmental Quality (DEQ) notified the Corps during the comment period that EISS-2 failed to describe water quality in relation to each of the applicable State water quality standards and that such a discussion was necessary to "make the analyses more meaningful and to properly evaluate and consider the cumulative effects," Corps responded by stating that temperature and turbidity were the only water quality standards raised as concerns during the scoping process.
 
 
 22
 Similarly, the Corps ignored suggestions that it consider the cumulative impacts on flows during flood events. The Corps recognized in EISS-2 that the effects of reservoirs on flows are most noticeable during spring filling, summer/fall drawdown, and flood events, but EISS-2 discusses the cumulative impacts of the dams only during spring filling and summer/fall drawdown. When ONRC noted during the comment period that the Corps should also describe the effect of the dams on flows during the flood control season, Corps' only response was that the effect of the dams on flows during flood events was not "identified as an issue" by our opinion in Marsh II or during the scoping process.
 
 
 23
 That Corps limited the areas of its cumulative impacts analysis is apparent even in the summary of EISS-2, which is required to stress "areas of controversy (including issues raised by agencies and the public)." See 40 C.F.R. Sec. 1502.12. Under "ISSUES ADDRESSED IN THIS EIS SUPPLEMENT," EISS-2 reads:
 
 
 24
 "The issues identified by the Ninth Circuit Court and through the scoping process are the effects of the project on flows, water temperatures, and turbidity and the related effects on fish production and fishing in the Rogue River; the effects of the project on wildlife, and the proposed mitigation of those effects; and the effects of the project on recreation and the local economy. These issues are all addressed in this Supplement."
 
 
 25
 Although the scoping process will normally identify most of the significant areas of discussion, see 40 C.F.R. Sec. 1501.7 (describing the scoping process), the Corps cannot forever omit a factor from the scope of an EIS solely because the factor was not raised as a concern during the scoping process. An agency preparing an EIS has a duty to assess, consider, and respond to all comments, even those relating to environmental factors not mentioned during the scoping process. See id. Sec. 1503.4(a). Although the agency is not required to include in its final analysis every factor raised by such a comment and may respond, for example, by explaining why the comment does not warrant agency response, id. Sec. 1503.4(a)(5), the mere fact that the comment raises concerns not mentioned during the scoping process does not establish that the comment warrants no further discussion. To hold otherwise would undermine "NEPA's purpose of ensuring well-informed government decisions and stimulating public comment on agency actions." Competitive Enter. Inst. v. National Highway Traffic Safety Admin., 901 F.2d 107, 123 (D.C.Cir.1990).
 
 
 26
 Because of the Corps' refusal even to consider environmental factors not specifically identified by this court in Marsh II or raised during the scoping process, EISS-2's cumulative impacts analysis omits issues of critical importance. Although we already have noted various deficiencies in EISS-2's discussion of the inanimate environment, we are most disturbed by EISS-2's inadequate analysis of Elk Creek Dam's effects on the Rogue River's wild coho and summer steelhead populations. For instance, Elk Creek provides valuable spawning and rearing habitat for wild coho and steelhead in the Rogue Basin, but EISS-2 does not discuss the effect of losing Elk Creek's habitat on these populations and on fisheries beyond the Rogue River Basin. This omission is particularly disturbing in light of the Corps' failure to mention in EISS-2's description of fisheries that wild coho salmon are classified as a "sensitive" species by the State of Oregon.
 
 
 27
 The Corps attempts to excuse these and other omissions by pointing out that few wild coho still spawn in the upper portions of the Rogue River Basin, where Lost Creek and Elk Creek are located, and that EISS-2 included this fact in its description of the existing animate environment. The Corps' reliance is misplaced. Discussing the decline of the wild coho in Elk Creek is not a substitute for disclosing that the species is classified as "sensitive" for the Rogue River Basin as a whole. More importantly, the scarcity of wild coho within Elk Creek renders a discussion of the dams' detrimental effects on fish and fish production more imperative, not less. If the species generally was abundant but found relatively infrequently in Elk Creek, then preserving the habitat within the Elk Creek tributary for the relatively few number of fish found there might not be critical; however, given that the species as a whole is considered "sensitive," protection of these fish takes on new importance.
 
 
 28
 Because EISS-2 does not comply with our mandate in Marsh II, the Corps must prepare an additional EISS discussing the impact of the Elk Creek Dam in conjunction with the other Rogue River Basin projects, with regard not just to those factors specifically identified by us, but to all environmental factors essential to an informed agency decision. ONRC urges us to go further and to require the Corps either to demolish the partially-built Elk Creek Dam or to remove the dam's spillway. As discussed in our opinion filed today in Harrell, 52 F.3d at 1508, such extraordinary relief is not warranted at this time in light of the less than fully developed record regarding the necessity, cost, and potential consequences of destruction.
 
 III
 
 29
 ONRC also appeals the district court's denial of its request for attorneys fees under the EAJA. It argues, first, that it was the prevailing party on issues other than cumulative impacts; therefore, ONRC argues, the district court should have awarded attorneys fees unless the Corps established that its litigation positions on these issues were substantially justified. Second, ONRC argues that the district court abused its discretion in determining that the Corps' argument in Marsh I and II--that EISS-1 adequately discussed cumulative impacts--was substantially justified.
 
 
 30
 * ONRC argues that our decision on cumulative impacts was not the only holding in Marsh II to survive Marsh IV intact. It contends that the Supreme Court did not reverse our decision in Marsh II to the extent that we held that the Corps should have discussed the effectiveness of the proposed mitigation measures and that scientific uncertainty existed with regard to the impact of the Elk Creek Dam on turbidity.
 
 
 31
 The district court held correctly that ONRC was not a prevailing party on these issues. Despite ONRC's attempt to portray it as a separate "holding," our decision in Marsh II to require the Corps to discuss the effectiveness of the proposed mitigation measures was one component of our call for a more thorough discussion of mitigation. The Supreme Court summarized Marsh II correctly when it stated that we held that EISS-1 "was defective because it did not include a complete mitigation plan." See Marsh IV, 490 U.S. 360, 109 S.Ct. 1851. In Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348-53, 109 S.Ct. 1835, 1844-47, 104 L.Ed.2d 351 (1989), the companion case to Marsh IV, the Supreme Court rejected a requirement for a broad mitigation discussion. Accordingly, the Court in Marsh IV reversed our holding on the mitigation issue as "erroneous." 490 U.S. at 369, 109 S.Ct. at 1857. We cannot say that our decision regarding EISS-1's analysis of the effectiveness of mitigation measures survived Marsh IV.
 
 
 32
 ONRC also argues that, although the Supreme Court reversed our decision to require the Corps to conduct a "worst case" analysis, it left standing our determination that scientific uncertainty existed regarding the impact of the Elk Creek project on turbidity. However, even if this determination can be said to survive Supreme Court review, its relevance does not. The Supreme Court held that we should not have relied on a rescinded regulation, under which the duty to conduct a worst case analysis or further research was triggered by "scientific uncertainty," see 40 C.F.R. Sec. 1502.22(a) (1985), because, contrary to our reasoning, the regulation was not a codification of prior NEPA case law. Marsh IV, 490 U.S. at 369, 109 S.Ct. at 1857; Robertson, 490 U.S. at 354-56, 109 S.Ct. at 1848-49. Rather, we should have applied the amended regulation, under which only "incomplete or unavailable information" triggered the agency's additional obligations. Id.; see 40 C.F.R. Sec. 1502.22(a) (1988). Because we reached the issue of scientific uncertainty only because we applied an inappropriate legal standard, we reject ONRC's characterization of that determination as an independent "holding" on which it was the prevailing party.B
 
 
 33
 The more difficult issue is whether the district court should have granted ONRC's request for attorneys fees associated with litigating EISS-1's failure to include an analysis of cumulative impacts, an issue on which ONRC prevailed in Marsh II and which was not reviewed by the Supreme Court. The district court recognized that ONRC was the prevailing party on the issue of cumulative impacts, but denied ONRC's request for attorneys fees on the ground that the Corps' argument that it had adequately discussed cumulative impacts was substantially justified.[2]
 
 
 34
 The burden is on the Corps to show that its position in Marsh I and Marsh II, though erroneous, was substantially justified. Yang v. Shalala, 22 F.3d 213, 217 (9th Cir.1994). We review for an abuse of discretion the district court's decision that the Corps has met this burden. Williams v. Bowen, 966 F.2d 1259, 1260 (9th Cir.1991). "The district court abuses its discretion when its 'decision is based on an erroneous conclusion of law or when the record contains no evidence on which [it] rationally could have based that decision.' " Kali v. Bowen, 854 F.2d 329, 331 (9th Cir.1988) (quoting In re Hill, 775 F.2d 1037, 1040 (9th Cir.1985)).
 
 
 35
 The district court held that, although we determined in Marsh II that EISS-1's cumulative impacts discussion was deficient, the Corps had "considered the existing conditions and anticipated future consequences with and without the Elk Creek project. The 'existing conditions,' at this third and final stage of the broader ongoing project, included the already completed portion of the Rogue River Basin Project." The district court appeared to believe that the Corps was required to prove substantial justification only with regard to the two deficiencies specifically identified by this court. The district court abused its discretion in relying on this finding as an indicator that the Corps had given some consideration to cumulative impacts. It was bound, as are we, by our decision in Marsh II that the Corps failed to discuss the environmental impacts of the Elk Creek Dam in conjunction with the Applegate River and Lost Creek Dams. As we have already explained in discussing the scope of the analysis that should have been included in EISS-2, we did not hold in Marsh II that the Corps' cumulative impacts analysis was insufficiently thorough. Rather, our mandate that "Corps should consider the impact of Elk Creek Dam in conjunction with Lost Creek Dam and, if appropriate, Applegate River Dam," 832 F.2d at 1498, reflects our conclusion that the Corps had not addressed cumulative impacts at all.
 
 
 36
 The duty to discuss cumulative impacts in an EIS is mandatory and is not within the agency's discretion. See 40 C.F.R. Secs. 1502.16, 1508.7-8. Although the government can lose on the merits but still have a substantially justified position, our opinion in Marsh II, holding that the Corps completely omitted an area of analysis clearly required by the regulations implementing NEPA, establishes that this is not such a case. See ONRC v. Madigan, 980 F.2d 1330, 1332 (9th Cir.1992) (decision that statutory language clearly set forth a duty to issue regulations foreclosed government's position that it was substantially justified in arguing that the language was subject to different interpretations).
 
 
 37
 Moreover, the district court indicated that the Corps was required to prove substantial justification only with regard to the two deficiencies specifically identified by this court. To the extent that the district court relied on this excessively narrow interpretation of our mandate in Marsh II in assessing substantial justification, the district court erred. In fact, the Corps' position on the two water quality issues specifically identified by the court as representative of EISS-1's general defectiveness establish that the Corps' approach to the cumulative impacts discussion was not substantially justified. The Corps had responded to an EPA comment concerning the cumulative impact on water quality not by arguing that its existing discussion was adequate, but by stating that the Elk Creek EISS-1 was an inappropriate forum to discuss the effect of the Lost Creek Lake Dam. 832 F.2d at 1498. Moreover, the EISS-1 did not include any consideration of the environmental impact of the increased turbidity from the Elk Creek Dam in combination with the Lost Creek Lake and Applegate River Dams. Id. The Corps argues that in Marsh II we read its response to the EPA comment "out of context." Similarly, the Corps argues that our second observation in Marsh II, that EISS-1 failed to consider the Elk Creek Dam's effects on turbidity in conjunction with the Applegate River and Lost Creek Dams, was "contrary to the record." However, Corps' arguments amount to a misplaced attempt to relitigate issues already resolved in Marsh II.
 
 
 38
 The district court also erred in holding that the Corps could reasonably have concluded that EISS-1's reference to 1974 and 1979 water quality studies, which discussed the effects of Lost Creek Dam on water quality, adequately addressed the cumulative impact of the Rogue River Basin Projects on water quality. We agree with ONRC that, if the Corps did believe that reliance on the 1974 and 1979 studies was a sufficient substitute for including within EISS-1 an analysis of cumulative impacts, its belief was unreasonable because neither of those studies addressed the cumulative impact of turbidity changes upon fish production.
 
 
 39
 The Corps relies on the following language from Marsh IV to argue that its position was substantially justified: "Based on [1974 and 1979 water quality] studies, [EISS-1] predicted that changes in the 'turbidity regime' would not have any major effect on fish production, but that the combined effect of the Lost Creek and Elk Creek Dams on the turbidity of the Rogue River might, on occasion, impair fishing." 490 U.S. at 365-66, 109 S.Ct. at 1855. The Corps argues that this language evidences the Supreme Court's implicit recognition that EISS-1 contained a reasonably thorough cumulative impacts discussion.
 
 
 40
 We are not convinced. The statement is taken from the Supreme Court's summary of the background of the appeal and carries no indication of the Court's intention to undermine our holding in Marsh II. Moreover, the statement simply describes the fact that Corps relied on the 1974 and 1979 studies to conclude that the cumulative impact of the dams on turbidity might impair fishing, but says nothing regarding whether EISS-1 considered how the cumulative impact on turbidity might affect fish production or whether the Corps' reliance on the water quality studies as a substitute for an independent analysis of cumulative impacts was reasonable.
 
 
 41
 Although we affirm the district court's denial of ONRC's request for attorneys fees on the issues of mitigation of impacts and scientific uncertainty, we reverse the denial of fees on the issue of cumulative impacts. Corps was not substantially justified in arguing that EISS-1 fulfilled Corps' duty to discuss cumulative impacts. The district court's contrary decision was the result of its mistaken interpretation of our decision in Marsh II and was an abuse of discretion.
 
 IV
 
 42
 The Corps must prepare an additional EISS evaluating the impacts of adding Elk Creek Dam to the existing dams in the Rogue River Basin Project. In doing so, the Corps should consider any environmental factors essential to informed agency decisionmaking. ONRC should be awarded attorneys fees incurred both in the district court and this court litigating EISS-1's failure to discuss cumulative impacts. We transfer to the district court the determination of the appropriate amount of fees.
 
 
 43
 AFFIRMED IN PART, REVERSED IN PART, REMANDED.
 
 
 44
 RYMER, Circuit Judge, concurring in part and dissenting in part:
 
 
 45
 I concur in the majority opinion to the extent that it affirms the denial of attorneys' fees in part and denies relief in the form of removing or modifying the dam. Because I disagree with the majority that Corps' discussion of cumulative impacts failed to take a sufficiently hard look and that the government's position on cumulative impacts in Marsh I and II was not substantially justified, I dissent.
 
 
 46
 * Even assuming, as the majority concludes, that Corps attempts to read our mandate in Marsh II too narrowly, I would hold that the extensive environmental analysis provided in EISS-2 was sufficient to satisfy NEPA's requirement that an agency take a hard look at the environmental consequences of its actions.
 
 
 47
 ONRC identifies a number of specific respects in which EISS-2 is allegedly inadequate. Broadly stated, they are the failure to disclose and discuss adequately the existing animate and inanimate environment, as NEPA and the regulations require, 40 C.F.R. Sec. 1502.15, which ONRC maintains is indispensable to an adequate discussion of cumulative impacts. ONRC also points to Corps' failure to disclose and discuss all of the cumulative impacts completely.
 
 
 48
 * ONRC asserts that EISS-2 insufficiently describes water quality because it focuses on temperature and turbidity, whereas water quality is also a function of dissolved oxygen levels, pH, coliform levels, algal growths, and bottom or sludge deposits. It argues that Corps failed to comply with its obligation under 40 C.F.R. Sec. 1503.4(a)(3), which provides that supplementing, improving, or modifying analyses is an appropriate response to a comment, by ignoring the comment on the draft EISS-2 by the Oregon Department of Environmental Quality (DEQ) suggesting that discussion of all these factors is necessary to evaluate cumulative effects properly. Corps' response to the comment indicated that EISS-2 addresses the water quality elements which had been identified as concerns through the previous NEPA processes, i.e., effects of operation of the projects on water temperatures and turbidity in the Rogue River, and affirmed its commitment to develop and implement a water monitoring program to ensure continued compliance with the state water quality standards mentioned by DEQ.
 
 
 49
 Corps argues that its response suffices under 40 C.F.R. Sec. 1503.4(a)(5), which allows an agency to "[e]xplain why the comments do not warrant further agency response, citing ... reasons which support the agency's position." See Marsh II, 832 F.2d at 1488-89 (agency may place opposing views in separate comment and responses section with thoughtful responses). Although it is a close question, I agree. Considering the scoping process turned up no substantial concern about factors other than temperature and turbidity, and DEQ itself issued a State Water Quality Certification for the Elk Creek Dam project, I believe that the detailed discussion in EISS-2 of the importance of water temperature and its effect on the ecological and aquatic environment, the effects of the dam construction on temperature, and the effects of turbidity caused by the Rogue River Basin Project provide enough information about incremental impact of the Elk Creek Dam to comply with our mandate.
 
 B
 
 50
 ONRC argues that EISS-2's description of the animate environment is inadequate because it fails to note that wild coho salmon are on Oregon's list of sensitive species; does not describe aquatic invertebrates, which are a major source of food for fish; and neglects to describe how the Rogue River basin's ecosystems function as a whole. Corps contends that EISS-2 adequately describes existing conditions of the fish and fisheries production and the cumulative effects of the components of the Rogue River basin project upon these fish and fisheries production.
 
 
 51
 While it might have been preferable for EISS-2 specifically to acknowledge that wild coho are on the list of sensitive species, failing to do so is not fatal, as EISS-2 does discuss the fact that few wild coho are spawning in the upper portions of the basin, including Elk Creek, and that while Elk Creek supports coho salmon, few still spawn there. Further, three comments (by the EPA, the Interior, and ODFW) point out that the wild coho salmon are on the state's list of sensitive species, ensuring that Corps was aware of this fact when it made its decision. As we recently observed in The Laguna Greenbelt, Inc. v. United States Department of Transportation, 42 F.3d 517, 527 (9th Cir.1994), "relief will not be granted if the decision-maker was otherwise fully informed as to the environmental consequences and NEPA's goals were met."
 
 
 52
 EISS-2 generally discusses the impact of temperature on fish emergence and growth, although it does not specifically mention invertebrate food organisms. This is sufficient, as ONRC's complaint of insufficiency stems from a comment by the EPA indicating that temperature alterations and changes in the thermal regime could affect the timing of food that is available when the fry emerge, and that comment was limited to the impact of the Conservation Pool Alternative. That Alternative was rejected, and ONRC suggests no other reason why the effect on emergence should have been discussed specifically in terms of invertebrates instead of generally, as the Corps elected to do.
 
 
 53
 Finally, ONRC's contention that while the parts may be described adequately, the ecosystem as a whole is not, also fails. Corps has undertaken a comprehensive review of the environment of the Rogue River Basin and the components that make up the basin's ecosystem. ONRC points to no particular respect in which the discussion falls short. Nor did any organization or governmental agency submit any comment during the comment period that suggested that the Corps' discussion of how the ecosystems function should have been focused differently. This substantially undercuts ONRC's claim that EISS-2's discussion of cumulative effects is irretrievably compromised. Additionally, we have previously held that "[a]bsent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency decision." Havasupai Tribe v. Robertson, 943 F.2d 32, 34 (9th Cir.1991). Given the extensive opportunity for comment that NEPA and CEQ regulations provide, and in the absence of intervening "new" information, I do not see how Corps' failure to discuss a topic that was never raised during either the scoping process or the circulation of the draft EIS could be arbitrary and capricious.
 
 
 54
 I therefore conclude that none of these imperfections, assuming them to be within the mandate on remand, is insufficient to render EISS-2's discussion of the environment inaccurate or inadequate for providing context for considering cumulative impacts.
 
 C
 
 55
 ONRC contends that Corps' failure to describe the environment adequately makes the discussion of cumulative impacts meaningless.
 
 
 56
 First, ONRC cites Corps' failure to disclose the import of losing Elk Creek's habitat for the Rogue River's populations of wild coho and summer steelhead. EISS-2 did not, however, fail either to describe the predicament facing those populations or the effect Elk Creek Dam would have. It refers to sixteen years of fisheries evaluations; indicates that there is no evidence that yearling coho increased or decreased post-dam at any site in the Rogue River; advises that few wild coho still spawn in Elk Creek; opines that little effect on wild summer steelhead spawning can be attributed to the upriver project in the Rogue River Basin because the majority of that spawning occurs elsewhere; and acknowledges that fish passage is an area of serious concern.
 
 
 57
 ONRC also argues that Corps cannot excuse its failure to discuss cumulative impacts on commercial ocean fisheries on the ground that those impacts "cannot be quantified at the present time." It notes that incomplete information relevant to reasonably foreseeable significant adverse impacts and essential to a reasoned choice among alternatives must be included, provided the costs of obtaining it are not exorbitant, 40 C.F.R. Sec. 1502.22(a), and that an environmental impact statement must evaluate these impacts "based upon theoretical approaches generally accepted in the scientific community." Id. at Sec. 1502.22(b)(4). Corps analyzed the cumulative impacts on the local economy, but not on commercial ocean fisheries; it did, however, discuss the release of hatchery fish, which it claims may compensate for any economic loss to ocean fisheries of wild runs due to operation of the basin project. ONRC has not shown that Corps' failure to go further is arbitrary and capricious, particularly in light of the disclosure that few wild coho or spring/fall chinook salmon spawn in the Elk Creek watershed. Therefore, even if Corps is obliged to discuss purely economic effects, a question we need not decide, it sufficiently evaluated the effects of the basin project.
 
 
 58
 ONRC additionally maintains that EISS-2 inadequately discusses all the significant effects of Lost Creek and Applegate Lakes on flows during flood events. Corps states in EISS-2 that "[f]or long term reservoir studies there are two seasons during the year which are of particular interest: spring filling and summer/fall drawdown. These are the times of year when the effects of reservoirs are most notable, except for the regulation of flood events." Thus, ONRC contends, EISS-2 should also have discussed more thoroughly the impacts of flood regulation. I cannot conclude that Corps did not take a hard enough look at flood flows in light of EISS-2's discussion of water control regulation at the dam, how the releases would be regulated to avoid excessive downstream flow, the periodicity of flood events, and the survival of chinook and steelhead eggs during flood control operations.
 
 
 59
 Finally, ONRC asserts that Corps' worst omission was its failure to discuss the long-term cumulative impacts of temperature, turbidity, habitat alterations, and hatchery releases on anadromous fish. Its argument rests on EISS-2's disclosure that "the cumulative effect of Elk Creek [at full pool] and Lost Creek Lakes" would be that spring and fall chinook would emerge earlier than under pre-dam conditions and might suffer from increased mortality as a result. However, this disclosure pertains to the rejected Full Pool Alternative, and ONRC does not suggest how it is material to the No Conservation Pool Alternative. Likewise, ONRC's argument that Corps cannot avoid discussing the long-term impact of increased water temperatures because they are not yet known is unavailing because the deficiency also pertains only to an alternative rejected by Corps because of its environmental impact. Therefore, information about long-term cumulative impacts on anadromous fish that is not provided in EISS-2 is not "essential to a reasoned choice among alternatives," 40 C.F.R. Sec. 1502.22(a), and the Corps had no duty to obtain it.
 
 
 60
 In sum, I would conclude that the more than 1100 pages of report and appendices in EISS-2 are appropriately "analytic rather than encyclopedic." 40 C.F.R. Sec. 1502.2. Its "form, content and preparation" are sufficient to "foster both informed decision-making and informed public participation." State of California v. Block, 690 F.2d 753, 761 (9th Cir.1982). While EISS-1 failed to pass muster for lack of discussion of cumulative impacts, EISS-2 provides an expansive discussion that should suffice. Whether selected areas should have been plumbed deeper or analyzed differently is a question requiring the agency's environmental expertise; therefore, we may only disturb the agency's decisions if it is arbitrary and capricious. Overall, I cannot say that any of the deficiencies asserted by ONRC show that Corps failed its NEPA obligation to take a "hard look" at the cumulative impact of the basin project. Accordingly, I would hold that the district court did not err in dismissing the action.[1]
 
 II
 
 61
 Finding that the government's position on sufficiency of Corps' cumulative impacts analysis was substantially justified, the district court denied ONRC's request for attorneys fees under EAJA. While I agree with the majority that this is a difficult issue, I disagree with its result. In light of the difficulty of the question and the abuse of discretion standard of review, the district court should be affirmed as to its denial of attorneys' fees.
 
 
 62
 * The district court focused on whether the Corps could reasonably have thought it had adequately complied with the obligation set out in 40 C.F.R. Sec. 1508.7, to consider the cumulative impacts of proposed actions, on which it was the prevailing party in Marsh II and Marsh III. The court noted that EISS-1 described the cumulative impacts on the physical, biological, and human elements of the environment, paying particular attention to water quality, fish production (including detrimental effects on anadromous fish), and fishing; and that the Corps had considered the existing conditions (including the already completed portion of the Rogue River Basin Project) and anticipated future consequences with and without the Elk Creek project. As to the two flaws Marsh II cited as representative examples of the general defectiveness of EISS-1, the district court explained that, despite the fact that the supplemental statement did not itself discuss cumulative impact on turbidity, the Corps could reasonably have believed that its reference to 1974 and 1979 Water Quality Studies, which provided a state of the art analysis of turbidity contributed by the Lost Creek Dam, adequately addressed the cumulative impact of turbidity from both dams. (In this connection the district court found that Corps could reasonably have believed it was unnecessary to discuss turbidity contributions from the Applegate Dam because of geographical remoteness.) On the question of water quality, the district court found that the 1974 and 1979 Water Quality Studies included discussion of the effects of Lost Creek Dam on downstream water quality in relation to the effects of Elk Creek Dam that a reasonable person could think sufficed. Based on these findings, the court concluded that reasonable minds could differ on whether the Corps was correct to assert that it had taken a sufficiently hard look at cumulative impacts to go forward with the project; and that its litigation position was reasonable.
 
 
 63
 There is no dispute that ONRC was the prevailing party on the cumulative impacts issue in Marsh II and on remand, when the district court enjoined further construction of the dam at its behest. Marsh III, 677 F.Supp. at 1077-78. However, ONRC argues that the district court erred in failing to recognize that the government had to justify its position on the mitigation of impacts and the uncertainty issues on which it contends the Ninth Circuit was not completely reversed in Marsh IV, as well as on cumulative impacts. In addition, ONRC urges that the district court erred by taking into account its own, overturned position on the merits; by concluding that the government argued "forcefully and well"; and by misinterpreting the scope of Marsh II's remand. Finally, it contends that the district court's finding that the government's position was substantially justified was based on clearly erroneous findings of fact.
 
 
 64
 ONRC's appeal turns on whether the district court abused its discretion in finding that the government's position was "justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). Although this question is never easy to resolve, I do not believe the panel can fairly say that the district court's reasoning lacks support in the record.[2]
 
 B
 
 65
 ONRC contends that the district court erroneously concluded that Corps argued "forcefully and well" and that no adverse precedent clearly foreclosed its litigation position because precedent clearly established the Corps' duty to discuss cumulative impacts.[3] However, the government has never argued that it had no such duty; its position (with which we disagreed in Marsh II ) was that Corps adequately considered the cumulative impacts in its report. This case is therefore unlike ONRC v. Madigan, 980 F.2d 1330 (9th Cir.1992), upon which ONRC and the majority rely. In Madigan, the underlying appeal ruled that there was a clear statutory duty to issue regulations; on the attorneys' fees appeal, therefore, both the district court and our court were bound by that holding. Here, we are bound by our earlier determination that EISS-1 did not take a hard enough look at cumulative impact, but since we did not hold that Corps had breached a clear duty, neither this court nor the district court is foreclosed from considering whether Corps' position was substantially justified. The district court accordingly did not err in concluding that in light of the earlier studies to which EISS-1 referred, Corps' position was "justified to a degree that could satisfy a reasonable person." Pierce, 487 U.S. at 565, 108 S.Ct. at 2541.
 
 
 66
 The majority overreads Marsh IV, asserting that "[o]ur mandate that 'Corps should consider the impact of Elk Creek Dam in conjunction with Lost Creek Dam and, if appropriate, Applegate River Dam,' 832 F.2d at 1498, reflects our conclusion that the Corps had not addressed the cumulative impacts at all," and that Marsh II held that "Corps completely omitted an area of analysis clearly required." Maj. op. at 1492. The analysis of Marsh IV was limited to "[P]laintiff's ... two examples of the Corps failure to consider the cumulative impacts." 832 F.2d at 1498. It is apparent from the discussion that the Marsh IV panel not only did not conclude that "the Corps had not addressed cumulative impacts at all, " but that it never even considered the issue. Rather, the panel agreed that the two examples showed deficiencies in that analysis, and ordered that the Corps correct deficiencies in the cumulative analysis. This minimal statement is insufficient to bind the hands of the district court in determining whether Corps' position was substantially justified.[4]
 
 C
 
 67
 ONRC submits that the district court clearly erred in finding the Corps' position substantially justified based on the 1974 and 1979 studies, because neither study addressed the cumulative impact of turbidity on fish production (although they did address the cumulative impact of turbidity on water quality). It suffices to quote the Supreme Court's opinion in Marsh IV: "Based on these [1974 and 1979] studies, the FEISS predicted that changes in the 'turbidity regime' would not have any major effect on fish production, but that the combined effect of the Lost Creek and Elk Creek Dams on the turbidity of the Rogue River might, on occasion, impair fishing." 490 U.S. at 365-66, 109 S.Ct. at 1855. Whether or not the Corps' report adequately addressed these cumulative impacts was a question on which reasonable minds could differ; I cannot, therefore, say that the district court abused its discretion in determining that the Corps' position was substantially justified. Accordingly, I would affirm its denial of attorneys' fees.
 
 III
 
 68
 While I concur in the denial of the extraordinary relief sought by ONRC, I would deny the relief on the basis that no violation has been shown, and thus no remedy is warranted.
 
 
 
 [1]
 Other plaintiffs, referred to collectively as ONRC, are Oregon Guides and Packers Association, Inc., Rogue Flyfishers, Inc., and Rogue River Guides Association
 
 
 [2]
 The district court initially denied ONRC's request without explanation other than that the Corps' position was substantially justified, and we vacated and remanded for the district court to enter specific findings
 
 
 [1]
 Because I consider the environmental evaluation adequate, I do not discuss the appropriateness of the order to prepare a new supplement
 
 
 [2]
 I concur in the majority's discussion of the victories allegedly left intact by the Supreme Court's decision in Marsh IV
 
 
 [3]
 The majority chooses not to address ONRC's contention that the district court erred in considering its own earlier ruling. The district court was not in error for two reasons. First, the court's opinion acknowledges that its initial ruling is not dispositive. While a district court's original agreement with a government position does not conclusively demonstrate the position was reasonable, Thomas v. Peterson 841 F.2d 332, 336 (9th Cir.1988), the failure of a government position to prevail does not establish a presumption that the position itself was unreasonable, Kali v. Bowen, 854 F.2d 329, 334 (9th Cir.1988); Pierce, 487 U.S. at 569, 108 S.Ct. at 2552 ("Conceivably, the Government could take a position that is not substantially justified, yet win; even more likely, it could take a position that is substantially justified, yet lose"). In any event, the court's opinion relies on what EISS-1 described and the extent to which it, in conjunction with the 1974 and 1979 Water Quality Standards, addressed cumulative effects--not on its conclusion in Marsh I
 
 
 [4]
 The majority asserts that "the district court appears to believe that the Corps was required to prove substantial justification only with regard to the specific deficiencies identified by this court." Maj. op. at 1492. However, the district court explicitly noted that we identified the two flaws as representative examples of general defectiveness, addressed the specific claimed examples of deficiency, and was "satisfied that the remaining deficiencies in the 1980 EISS are of a similar nature." I do not, therefore, believe that the majority's assessment of how the district court perceived its task is well founded